### UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

**MONSANTO COMPANY and**
**MONSANTO TECHNOLOGY, LLC,**

      **Plaintiffs,**

**v.**                               **Case No.: 4:14-cv-00870-JAR**

**OMEGA FARM SUPPLY, INC., d/b/a**
**OMEGA FARM SUPPLY & GIN**
**COMPANY,**

      **Defendant.**

---

### DEFENDANT OMEGA FARM SUPPLY, INC.'S MOTION TO DISMISS COUNTS I, II, AND IV OF PLAINTIFF MONSANTO COMPANY'S COMPLAINT AND MOTION TO TRANSFER REMAINING COUNTS DUE TO IMPROPER VENUE

Defendant Omega Farm Supply, Inc. ("Omega"), by and through their undersigned counsel and pursuant to Rule 12 of the Federal Rules of Civil Procedure, bring the following Motion to Dismiss: 1) Monsanto's Complaint Count I for Breach of Contract, 2) Monsanto's Complaint Count II for Inducement to Infringe U.S. Patent No. 6,949,696, and 3) Monsanto's Complaint Count IV for Inducement to Infringe U.S. Patent No. 7,064,249. Omega additionally moves that, in the event of dismissal of Monsanto's Complaint Count I for Breach of Contract, the Court find that venue is improper and transfer this case to the Middle District of Georgia pursuant to 28 U.S.C. § 1404.

**I. Monsanto's Complaint Count I for Breach of Contract Should be Dismissed as the Brand Seed Dealer Agreement is Inapplicable to This Action**

**A.**       **The Brand Seed Dealer Agreement Covers Only Four Brands of Seed.**

The contract between Monsanto and Omega is inapplicable because it does not address the seed at issue. Monsanto's claim that the Brand Seed Dealer Agreement is applicable must fail because Monsanto has failed to allege any activity in the Complaint that involved the products covered by the Brand Seed Dealer Agreement. Thus, the breach of contract claim should be dismissed for failure to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6).

Terms of a contract are to be read as a whole and given their plain, ordinary and usual meaning. In interpreting a contract, the Courts' central obligation is to "ascertain the intention of the parties and to give effect to that intent." To determine the intent of the parties, the terms of a contract are read as a whole, and given their plain, ordinary, and usual meaning. *Rias v. Safeco Ins. Co. of America*, 594 F.Supp.2d 1090, 1095 (E.D. Mo. 2009) citing *Pepsi Midamerica v. Harris*, 232 S.W.3d 648, 654–55 (Mo.Ct.App. 2007).

Monsanto alleges that Omega breached the Brand Seed Dealer Agreement, which states: "This Monsanto Brand Seed Dealer Agreement establishes a dealership for the resale of DEKALB seed, Asgrow seed, Nexgen seed, and Stoneville seed." Exhibit 1 ("Monsanto Brand Seed Dealer Agreement"), paragraph 1.

Monsanto's complaint fails to allege that Omega took any improper action whatsoever as to the actual brands covered by the Brand Seed Dealer Agreement. Instead, Monsanto vaguely alleges the contract gave Omega the right "to sell Monsanto seed brands." Exhibit 1, paragraph 19. While this statement is true in the sense that the agreement gave Omega the right to sell some Monsanto seed brands, it did not cover all Monsanto brands of seed. Importantly, Monsanto fails to allege that any of the brands of seed covered by the agreement are actually at

2

issue in this case.  It is believed that the seed at issue in this case is Delta Pine brand seed as well as other seed that is sold under brands not owned by Monsanto.[1]

It is not disputed that Omega sold other Monsanto brands of seed; however, such seed was not covered by this particular agreement that Monsanto alleges is applicable to this matter. In addition, the Agreement, on its face grants Omega a license to sell only the seeds listed above:

> Monsanto grants a limited, non-exclusive, non-royalty bearing license to Dealer to transfer and/or sell DEKALB, Asgrow, Nexgen and/or Stoneville seed containing one or more of Monsanto's patented technologies ("Monsanto Technologies") to other DEKALB, Asgrow, Nexgen and/or Stoneville authorized dealers, other entities authorized by this Agreement, and to growers that have obtained a license to grow seed containing Monsanto Technologies by having signed a Monsanto Technology / Stewardship Agreement that has been accepted by Monsanto and is in good standing as listed at www.farmsource.com. Exhibit 1, paragraph 7.

The plain language of the Brand Seed Dealer Agreement limits Dealer's license to sell seed under the agreement to DEKALB, Asgrow, Nexgen, and Stoneville seeds.  Still, Monsanto fails to allege at any point in their Complaint that any of these brands of seed are the same brands of seed that are the subject of the Complaint.

This Complaint relates only to cotton seed.  The only one of these brands that was being sold as cotton seed during the applicable time period was Stoneville.  But, Stoneville is no longer a Monsanto brand.  *See* Exhibit 2 and Exhibit 3, http://www.lexology.com/library/detail.aspx?g=bd9632c4-5d6f-4803-8d0d-1d64bdf36715. (Stating that Monsanto was required to divest Stoneville in 2007 as a result of its purchase of Delta and Pine Land.)  While Nexgen is a brand that sells cotton seed, it was also divested by Monsanto in 2007.  *See* Exhibit 4, http://news.monsanto.com/press-release/monsanto-company-completes-divestiture-stoneville-and-nexgen-businesses-begins-combini.

---

[1] Delta Pine is the only brand of cotton seed sold by Monsanto at this time.  *See* Exhibits 2 and 3.

The Brand Seed Dealer Agreement relied on by Monsanto thus has not covered any cotton seed owned by plaintiff since 2007. It should be noted that the statute of limitations for an action on a contract in Missouri is 5 years. "Within five years: (1) All actions upon contracts, obligations or liabilities, express or implied, except those mentioned in section 516.110, and except upon judgments or decrees of a court of record, and except where a different time is herein limited." V.A.M.S. § 516.120(a). Here, it has been nearly seven years since Monsanto owned either of these brands.

**B.    The Brand Seed Dealer Agreement is inapplicable to the current case as the patents alleged to have been violated were not in existence at the time of the agreement.**

The Agreement was entered into on August 12, 2005. Exhibit 1. The patents alleged to have been violated were not issued until after August 12, 2005: U.S. Patent No 7,064,249 issued on June 20, 2006 and U.S. Patent No. 6, 949,696 issued on September 27, 2005.

The Agreement grants licenses related to "DEKALB, Asgrow, Nexgen and/or Stoneville seed containing one or more of Monsanto's patent technologies". Exhibit 1, paragraph 7. Monsanto's Complaint never alleges that the patents in issue cover DEKALB, Asgrow, Nexgen and/or Stoneville seeds. The Agreement doesn't state that Delta Pine seed is covered by "Monsanto's patent technologies". In other words, this Agreement is wholly inapplicable to any claims of infringement of the asserted patents.

**II.    Because the Agreement is inapplicable, venue is inappropriate in the Eastern District of Missouri.**

As the Agreement is inapplicable, venue in the Eastern District of Missouri is inappropriate. "For the convenience of parties and witnesses, in the interest of justice, a district

4

court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). In determining whether § 1404(a) transfer is warranted, the statute instructs courts to consider three factors: (1) the convenience of the parties, (2) the convenience of witnesses, and (3) the interest of justice. *Terra Int'l, Inc. v. Mississippi Chem. Corp.*, 119 F.3d 688, 691 (8th Cir. 1997). The analysis is not limited to those enumerated factors, as § 1404(a) "determinations require a case-by-case evaluation of the particular circumstances at hand and a consideration of all relevant factors." *Id.* The goals of § 1404(a) are to prevent "waste of time, energy and money, and to protect litigants, witnesses, and the public against unnecessary inconvenience and expense. *See Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964) (citations omitted).

### A.    This Case Could Have Been Brought in the Middle District of Georgia

The threshold inquiry in ruling on a motion under § 1404(a) is whether a case might have been brought in the proposed transferee district. *See Van Dusen v. Barrack*, 376 U.S. 612, 616, 84 S. Ct. 805, 11 L. Ed. 2d 945 (1964). Omega is a Georgia resident with its place of business located in the Middle District of Georgia. Therefore, venue over the patent infringement claims is proper in the Middle District of Georgia. 28 U.S.C. § 1400 (venue proper in patent cases in the district where the defendant resides or has a regular and established place of business). This case satisfies the threshold requirement for transfer to the Middle District of Georgia because it could have been brought there.

### B.    The Convenience of Parties Factors Favor Transfer to the Middle District of Georgia

With respect to the convenience categories, the Eighth Circuit has stated it is appropriate for a court to consider: (1) the convenience of the parties, (2) the convenience of the witnesses—

5

including the willingness of witnesses to appear, the ability to subpoena witnesses, and the adequacy of deposition testimony, (3) the accessibility to records and documents, (4) the location where the conduct complained of occurred, and (5) the application of each forum state's substantive law. *Terra* 119 F.3d at 696.

### 1.    The Middle District of Georgia is a More Convenient Forum for the Witnesses

Omega is a Georgia company located in the Middle District of Georgia.  All employees responsible for the work, development, and marketing of Omega's business, including all of its cotton gin products, are located in the Middle District of Georgia.  Thus, the Middle District of Georgia is clearly the more convenient forum for Defendant's employees.  There are very few relevant witnesses for Monsanto that would be located in the Eastern District of Missouri that would have relevant information to support the allegations.

### 2.    Relative Ease of Access to Sources of Proof

The place where Omega's documents are kept favors transfer to that location because, in patent infringement cases, the bulk of the relevant evidence usually comes from the accused infringer.  *In re Genentech, Inc.* 566 F. 3d at 1345 (Fed. Cir. 2009).  Here, Omega's relevant documents are located virtually exclusively in the Middle District of Georgia.  This factor weighs in favor of transferring this case to the Middle District of Georgia.

### 3.    The Availability of Compulsory Process Favors Transfer to the Middle District of Georgia

As shown above, Omega's principal place of business is in the Middle District of Georgia, and all employees reside there.  Moreover, potentially important third party witnesses with information regarding Omega's activities live in the Middle District of Georgia.  The ability

to subpoena those non-party witnesses in particular favors transfer to the Middle District of Georgia. This factor thus also favors transferring the case to the Middle District of Georgia.

### 4.    The Location of the Conduct Alleged in the Complaint is in the Middle District of Georgia

The Middle District of Georgia has a substantially greater factual connection to this case than the Eastern District of Missouri. All of Omega's employees are based there. Omega is an established business that employs many people in the Middle District of Georgia in the agricultural industry. Omega's cotton gin, where Monsanto alleges infringement took place is similarly located in the Middle District of Georgia.

### 5.    The Application of Each Forum's Substantive Law is a Neutral Factor

Because this is a patent case arising under federal law, both the Eastern District of Missouri and the Middle District of Georgia are equally familiar with the governing law. Here, the only facts supporting venue in the Eastern District of Missouri are the inapplicable contract. Venue is appropriate in the Middle District of Georgia and not the Eastern District of Missouri.

### C.    Interest of Justice Factors

In the "interest of justice" analysis, courts consider factors such as (1) judicial economy, (2) the plaintiff's choice of forum, (3) the comparative costs to the parties of litigating in each forum, (4) each party's ability to enforce a judgment, (5) obstacles to a fair trial, (6) conflict of law issues, and (7) the advantages of having a local court determine questions of local law. *Terra* 119 F.3d at 696.

The Eighth Circuit has stated that '[i]n general, federal courts give considerable deference to a plaintiff's choice of forum and thus the party seeking a transfer under section 1404(a) typically bears the burden of proving that a transfer is warranted.' *Terra,* 119 F.3d at

695. This general practice of according deference, however, is based on an assumption that the plaintiff's choice will be a convenient one. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255-56, 102 S. Ct. 252, 70 L. Ed. 2d 419 (1981). Here, the Eastern District of Missouri is not a convenient or appropriate venue.

The alleged activity occurred in the Middle District of Georgia. Omega is located in the Middle District of Georgia and is not alleged to have committed any activity in the Eastern District of Missouri. The vast majority of relevant witnesses and documents are located in the Middle District of Georgia. One of the inventors of the patents at issue (David R. Corbin) appears to reside near Indianapolis, IN. Travel by Omega to Missouri for deposition of the few remaining relevant witnesses in Missouri poses a burden on no one.

Indeed, even though Monsanto Technology has a facility located in St. Louis, Missouri, Monsanto also has facilities in 33 of the 50 states of the United States and in 66 countries. Most notably, Monsanto lists two locations in Tifton, GA, squarely in the Middle District of Georgia. See Exhibit 5 (Monsanto Locations). http://www.monsanto.com/whoweare/pages/georgia.aspx. In contrast with Missouri, the Middle District of Georgia has localized interest with regards to both parties in resolving this dispute.

Additionally, one of the factors in this case is that Monsanto charges different amounts for the technology at issue in different states and even different locales in the same state. As such, this case is particularly suited to be tried in the venue where the seed at issue is sold and planted.

The remaining factors are all neutral as they relate to the parties. As the case is at its earliest stages, no judicial economy can be lost at this point in time due to a venue transfer. The comparative costs to the parties of litigating in each forum remains the same as Monsanto will

have to travel to the Middle District of Georgia regardless of venue for depositions, and any relevant inspections of alleged infringing equipment and operations. Similarly, each party's ability to enforce a judgment and any obstacles to a fair trial stand unaffected by a change in venue. Furthermore, no conflict of law issues exist in the present matter.

Finally, there is no issue with losing advantages of having a local court determine questions of local law should the case be transferred from the Eastern District of Missouri to the Middle District of Georgia. With the dismissal of the contract claims, the only remaining claims involve federal patent law which can be applied equally in either venue.

### III.    Monsanto's Complaint Counts II and IV for Inducement of Infringement as Defendant lacked the required Specific Intent to Induce Another to Infringe

To state a claim for inducing infringement, a party must establish that: (1) direct infringement occurred, (2) the accused infringer had knowledge of the patent, and (3) the accused infringer possessed specific intent to induce another to infringe the patent. *Wordtech Sys., Inc. v. Integrated Network Solutions, Inc.,* 609 F.3d 1308, 1315 (Fed. Cir. 2010); see also 35 U.S.C.A. § 271(b) (West 2013); *Broadcom Corp. v. Qualcomm Inc.,* 543 F.3d 683, 697-98 (Fed. Cir. 2008) (to prevail on a claim of induced infringement under 35 U.S.C. § 271(b), "the patentee must establish 'first that there has been direct infringement (by another), and second that the alleged infringer knowingly induced (another's) infringement and possessed specific intent to encourage another's infringement.'") (citing *ACCO Brands, Inc. v. ABA Locks Mfr. Co.,* 501 F.3d 1307, 1312 (Fed. Cir. 2007) (quoting *Minn. Mining & Mfg. Co. v. Chemque, Inc.,* 303 F.3d 1294, 1304-05 (Fed. Cir. 2002)).

Currently, the intent requirement for active inducement is governed by precedent set in *Global-Tech Appliances v. SEB,* decided by the US Supreme Court in 2011. See *Global-Tech*

*Appliances, Inc. v. SEB S.A.,* 131 S. Ct. 2060, 2065 (2011).   The Court in *Global-Tech* found that

the appropriate standard of intent for a claim of induced infringement was identical to the intent

requirement necessary to prove claims of contributory infringement; namely, in order to actively

induce infringement, the defendant "must know that the induced acts constitute patent

infringement." *Id.* at 2063, 2067–68.

The Court held that this knowledge could be shown directly or imputed through the

criminal concept of "willful blindness." *Id.* at 2068–69, 2071. The Court explained that

"deliberate indifference to a known risk that a patent exists is not the appropriate standard" to

impute knowledge through the doctrine of willful blindness, and concluded that, instead, the

plaintiff must prove a defendant was aware of the "high probability that a fact exists" and took

"deliberate actions to avoid learning of th[e] fact[s]." *Id.* at 2068, 2070.

Applied here, Monsanto's Complaint fails to plead sufficient facts to establish a plausible

claim that Omega possessed specific intent through an active step to induce another to infringe

the patents.   Monsanto nowhere alleges that Omega could have knowledge of each type of

cotton being subject to the ginning process (whether from very specific Monsanto seeds, or from

any of the endless other available types of cotton seeds available).  A cotton gin may separate

any type of cotton seed grown by any particular farmer from the provided cotton which is merely

identified by an identification number. (Doc 1 at ¶ 25.)  Taking Monsanto's assertions as true

would mean that there would be no way for Omega to know what type of seed a farmer's grown

cotton originated from.

A cotton gin does not distinguish between one cotton seed and the next, and there is no

way alleged that Omega could know what type of seed resulted in any given farmer's cotton

brought for processing.   Cotton brought to Omega from a farmer is not marked with patent

numbers. Cotton brought to Omega from a farmer is not identified by seed type, as a cotton gin does not need such knowledge. The only place that Monsanto alleges such seeds would be marked is when the seeds are in the bags in which they are originally sold (which Monsanto claims are marked with the '696 and '249 patents). These bags are long gone when a farmer brings his or her cotton to Omega. The only person with arguable knowledge of the patents based on Monsanto's allegations would be the farmers themselves upon original purchase.

The Agreement between Monsanto and Omega further evidences the lack of knowledge of Monsanto's asserted patents. The Agreement appears to license to Omega "seed containing one or more of Monsanto's patented technologies." This phrase, while ambiguous as to which of Monsanto's patents may actually apply, was also agreed to on August 12, 2005. Both of the patents at issue were granted after the Agreement between the parties. Monsanto nowhere alleges that the Agreement was later modified to put Omega on notice of the patents at issue.

The only other allegation that would result in Omega having knowledge that a farmer's cotton would contain technology covered by the patents at issue is that Omega when receiving the farmer's cotton at the gin, could identify that the resultant separated seeds contained a "DNA construct comprising a chimeric promoter DNA sequence comprising SEQ ID NO:28; a structural DNA sequence encoding a glyphosate tolerance protein; and a 3′ non-translated region that functions in plants to cause the addition of polyadenylated nucleotides to the 3′ end of the RNA sequence; wherein the structural DNA sequence is operably linked to the chimeric promoter and the 3′ non-translated region, and the chimeric promoter DNA sequence is heterologous with respect to the structural DNA sequence" or was "a plant or plant tissue transformed to contain a nucleotide sequence encoding a Cry2Ab insecticidal protein, wherein said nucleotide sequence is selected from the group consisting of SEQ ID NO:1 from nucleotide

position 2 through nucleotide position 1934, SEQ ID NO:13 from nucleotide position 17 through nucleotide position 3183, and SEQ ID NO:14 from nucleotide position 17 through nucleotide position 3092." *See '696 Patent*, Claim 1 and *'249 Patent*, Claim 1. That Omega could identify such properties upon eye examination of cotton seed is ludicrous.

Monsanto's Complaint (based on assuming the facts as alleged by Monsanto are true) merely asserts that "[a]t all relevant times, Omega was fully aware of the fact that the Roundup Ready Flex trait was covered by U.S. patents, including the '696 patent."   However, Monsanto is asserting patent infringement based on the sale of seeds that are identified to Omega as Roundup Ready Flex cotton.  In light of the above, even if Omega knew that originally bagged Roundup Ready Flex seeds were covered by "U.S. patents, including the '696 patent," there is still no allegation that Omega could know that farmer-supplied seeds would fall within the bounds of the '696 patent.  Subsequently, Omega could not have had specific intent to induce another to infringe the '696 patent.

Monsanto's Complaint (based on assuming the facts as alleged by Monsanto are true) further asserts that "At all relevant times, Omega was fully aware of the fact that the Bollgard II trait was covered by U.S. patents, including the '249 patent."   Again, Monsanto is asserting patent infringement based on the sale of seeds identified to Omega as Bollgard II cotton.  In light of the above, even if Omega knew that originally bagged Bollgard II seeds were covered by "U.S. patents, including the '249 patent," there is still no allegation that Omega could know that farmer-supplied seeds would fall within the bounds of the '249 patent.  Subsequently, Omega could not have had specific intent to induce another to infringe the '249 patent.

Many courts have found similar conclusory statements insufficient to sustain a claim for induced infringement because they amount to nothing more than "legal conclusions couched as

factual allegations." *See, e.g., Superior Indus., LLC v. Thor Global Enters. Ltd.,* 700 F.3d 1287, 1295-96 (Fed. Cir. 2012) (affirming dismissal of inducement claim because the complaint failed to allege any facts showing that the defendant acted with specific intent to induce others to violate the patent); *Sharafabadi v. Univ. of Idaho,* No. C09–1043JLR, 2009 WL 4432367 at *5 (W.D. Wash Nov. 27, 2009) (dismissing an inducement claim when the complaint lacked facts to establish acts which induced others to infringe the patent); *Fujitsu Ltd. v. Belkin Int'l, Inc.,* 2011 WL 1196417 *19-20 (N.D. Cal. 2011) (dismissing inducement claim for failure to adequately plead intent element); *Aguirre v. Powerchute Sports, LLC,* No. SA-10-cv-702, 2011 U.S. Dist. LEXIS 7672, at *14-*15 (W.D. Tex. Aug. 14, 2011) ("Absence of knowledge is a fatal flaw in a claim for indirect patent infringement. The indirect patent infringement claims against Octagon are dismissed.").

Under these circumstances, the claims for induced infringement under the '696 patent and the '249 patent are plainly deficient and should be dismissed. *See Halton, Co. v. Streivor, Inc.,* No. 10-cv-655, 2010 U.S. Dist. LEXIS 5049, at *1-2 (N.D. Cal. May 21, 2010) (dismissing inducement claim for failure to adequately plead various elements).

## IV. Conclusion

WHEREFORE, Omega respectfully request that the Court dismiss: 1) Monsanto's Complaint Count I for Breach of Contract, 2) Monsanto's Complaint Count II for Inducement to Infringe U.S. Patent No. 6,949,696, and 3) Monsanto's Complaint Count IV for Inducement to Infringe U.S. Patent No. 7,064,249. Omega additionally moves that, in the event of dismissal of Monsanto's Complaint Count I for Breach of Contract, the Court find that venue is improper and transfer this case to the Middle District of Georgia pursuant to 28 U.S.C. § 1404.in their entirety.

Dated:   June 16, 2014                    Respectfully submitted,


                                          /s/ Michael I. Krause
                                          Michael I. Krause
                                          mkrause@merchantgould.com
                                          Pro Hac Bar Number: 429286GA
                                          Jeffrey D. Blake
                                          Jblake@merchantgould.com
                                          Merchant and Gould
                                          191 Peachtree Street NE
                                          Suite 4300
                                          Atlanta, Georgia 30303
                                          Telephone: 404.954.5100

                                          J. L. King, II
                                          jlking@hudsonkinglaw.com
                                          Hudson King
                                          615 North Virginia Ave.
                                          P.O. Box 2520
                                          Tifton, Georgia 31793

                                          Attorneys for Defendant

# EXHIBIT 1

Case: 4:14-cv-00870   Doc. #: 12   Filed: 05/06/14   Page: 1 of 2 PageID #: 135

## MONSANTO BRAND SEED DEALER AGREEMENT

THIS AGREEMENT, made this **12** day of **Aug**, **2005** between Monsanto Company and its seed subsidiaries selling the brands below (collectively referred to as "Monsanto"), with principal offices at 800 N. Lindbergh Blvd., St. Louis, MO 63167, and

(Dealer) ~~OMEGA FS  0001031956~~  **Omega Farm Supply**

of (Street Address) ~~PO BOX 97~~  **1514 Georgia Ave.** (County) **TIFT**

(City) **OMEGA**  (State) **GA**  (Zip) **31775**

**In consideration of the mutual promises and covenants hereinafter set forth the parties agree as follow:**

1. This Monsanto Brand Seed Dealer Agreement establishes a dealership for the resale of DEKALB® seed, Asgrow® seed, and Stoneville® seed (hereinafter "Seed") and Dealer will operate pursuant to the terms of this Agreement and in accordance with the policies established and communicated to Dealer periodically by Monsanto

2. Monsanto will designate the Dealer as an authorized dealer in DEKALB brand, Asgrow brand, Nexgen brand, and/or Stoneville brand seed and by species and/or by specialty seed Monsanto may change the Dealer's designation. Monsanto will set Dealer the designated seed ("Seed") Newly introduced Seed may not be made available to all dealers because of limited supplies. Monsanto may allocate any limited supplies of a variety or hybrid of Seed for its own needs and to dealers and other customers as Monsanto deems fair or reasonable Dealer will pay for Seed and use its best efforts to actively promote and commercialize Seed to its customers and to prospects prospectically identified by Monsanto to Dealer Dealer's best efforts will include, but are not limited to, making calls on all prospects identified by Monsanto, Monsanto will charge Dealer the suggested retail price established by Monsanto for the Seed less applicable current Dealer discounts The parties agree that Monsanto's suggested retail price for a Seed may vary according to the address of the grower who purchases the Seed from Dealer or the location of that grower's fields *If Dealer fails to accurately report to Monsanto this type of sale, Monsanto may charge Dealer the highest price that exists in the United States for the relevant Seed.*

3. Dealer will pay for all Seed according to the payment terms specified in the current Dealer Seed Operations Manual published by Monsanto. In addition, Dealer agrees to pay late charges on past due payments as specified in the Dealer Seed Operations Manual. If Dealer fails to make timely payments in addition to late charges, Monsanto may elect to terminate this Agreement pursuant to paragraph 12

4. Dealer will complete accurately a Monsanto credit information form and will update its credit information upon request. This Agreement will not take effect until Monsanto approves a credit line for Dealer. Monsanto is not obligated to ship Seed to Dealer in excess of Dealer's credit line, and Monsanto may change the credit line at any time.

5. Dealer grants Monsanto a security interest in the Seed sold pursuant to this Agreement and in any proceeds or accounts receivable of Dealer arising from the commercialization of the Seed to secure any amounts owed to Monsanto Dealer will execute financing statements and related documents as Monsanto may reasonably request to perfect Monsanto's security interest.

6. Risk of loss to Seed will pass from Monsanto to Dealer upon transfer of Seed by Monsanto or Monsanto's designee to a carrier for delivery to Dealer or upon delivery to Dealer, whichever occurs first

7. Monsanto grants a limited, non-exclusive, non-royalty bearing license to Dealer to transfer and/or sell DEKALB, Asgrow, Nexgen and/or Stoneville seed containing one or more of Monsanto's patented technologies ("Monsanto Technologies") to other DEKALB, Asgrow, Nexgen and/or Stoneville authorized dealers, other entities authorized by this Agreement, and to growers that have obtained a license to grow seed containing Monsanto Technologies by having signed a Monsanto Technology/ Stewardship Agreement that has been accepted by Monsanto and is in good standing as listed at www.farmsource.com. Dealer agrees and acknowledges that it may not sign a Monsanto Technology/ Stewardship Agreement for a grower (See the most current version of the Dealer Seed Operations Manual for Monsanto's policy on signatures on Monsanto Technology/ Stewardship Agreements.) If Dealer sells seed containing Monsanto Technologies through unauthorized sales agents, to an unauthorized dealer, or to unlicensed growers, the sales will constitute a material breach of this Agreement and will result in patent infringement by the Dealer and the unauthorized purchasers.

8. Dealer will maintain complete and accurate records of all transactions related to Seed. Dealer shall educate growers on insect resistance management, grain channeling, and seed piracy issues as Monsanto may direct. Dealer shall report to Monsanto all planting of suspected pirated seed containing Monsanto Technologies or any use of such seed by a grower. Dealer understands that the Environmental Protection Agency requires accurate grower sales reporting for seed registration of some seed To fulfill that obligation, Dealer will accurately provide to Monsanto sales information on Seed Dealer sells or transfers using Monsanto's grower point of sale reporting system in a manner described in Monsanto's annual reporting guidelines applicable to the particular Seed (the "Reporting Guidelines" are located in the Dealer Seed Operations Manual). All of these obligations will also apply to Dealer in the case of Seed containing Monsanto Technologies acquired for Dealer's own use. For the latest stewardship requirements see the Stewardship Policy guidelines at www.farmsource.com.

9. Monsanto has the right to reduce any program payments otherwise due Dealer if Dealer fails to comply with any of the provisions of this Agreement Dealer grants to Monsanto the right to audit the last three years of Dealer's books and records to confirm compliance with the terms of this Agreement

10. Dealer may only establish a new or additional location addresses for itself for Monsanto's convenience, invoices, and/or statements with Monsanto's permission using the method described in paragraph 18. For pieces of Seed sold to Dealer that vary according to the Dealer's invoice location or the Grower's location or field location, Dealer shall be responsible to Monsanto for the correct price whether Dealer correctly reported to Monsanto the location of the sale or not.

11. Dealer will cooperate in Monsanto's enforcement efforts of Monsanto's contract rights, patent rights, and Patent Variety Protection rights including without limitation, providing copies of relevant documents and access to employees, consultants and agents with relevant information and causing such employees, consultants and agents to attend any depositions, hearings, or trials or assist in any other legal proceedings which Monsanto deems necessary. Dealer will cooperate in the defense of grower claims of any kind

12. Either party may terminate this Agreement at any time, with or without cause, upon delivery of a written notice of termination to the other party. A termination will not affect Dealer's obligation to pay monies due Monsanto that accrued before termination and any such money will become immediately due and payable upon termination. Monsanto's audit right shall survive any termination. Monsanto may assign this Agreement to any of its subsidiaries; Dealer may not assign the Agreement to anyone.

13. Seed and crop performance depend upon many conditions beyond the control of Monsanto including, among other things, weather, soil conditions, and other natural conditions. Successful farming requires a high degree of skill The following warranties and disclaimers and limitations as to warranties, damages and remedies are terms and conditions of sale for Monsanto seed and CANNOT BE MODIFIED OR AMENDED AT ANY TIME EXCEPT IN WRITING SIGNED BY MONSANTO Monsanto warrants that its seed conform to the label description on the bag and bag tags within reasonable tolerances. NO OTHER EXPRESS OR IMPLIED WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE IS MADE OR OFFERED BY MONSANTO OR MAY BE OFFERED BY DEALER.

14. The exclusive remedy of Dealer and the limit of the liability of Monsanto for any and all losses, injury or damages resulting from the use or handling of the Seed (including claims based in contract, negligence, seed liability, strict liability, tort, or otherwise) arising from this Agreement at the election of Monsanto, is the replacement of the quantity of Seed at issue. THE PARTIES AGREE THAT MONSANTO SHALL NOT BE LIABLE FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES As a condition precedent to Dealer asserting any claim for defects, claims for such defects in Seed must be presented to Monsanto immediately to enable immediate investigation of the claim and in no event shall Dealer's notification to Monsanto be more than thirty (30) days after the claim becomes known to Dealer

15. If Dealer desires to use any of Monsanto's trademarks other than on documents provided to Dealer by Monsanto, Dealer must obtain a separate trademark license from Monsanto

16. The parties further acknowledge and agree that there is no relationship of principal and agent between Monsanto and Dealer or between Monsanto and any of Dealer's officers, employees, or agents

17. Dealer must have at least one clean and dry building owned or leased for the purpose of storing seed or bulk facilities dedicated to storing seed. Dealer must comply with all local, state and federal laws, regulations and guidelines and Monsanto rules and regulations for storing seed in the building.

18. If Dealer orders Seed for sales from multiple locations or orders Seed for parties other than Dealer, Dealer shall provide Monsanto with a list of those locations and entities and their addresses. Dealer shall provide Monsanto with an updated list, if changes have been made, during the dates specified by Monsanto in the then current Dealer Seed Operations Manual of each year The list shall substantially conform to Exhibit A attached hereto All locations and entities submitted by Dealer shall be deemed approved by Monsanto, but Monsanto may withdraw its approval as to any location or entity at anytime by written notice to Dealer Dealer may only order for locations and entities on the list that are approved by Monsanto Dealer agrees that it is responsible for the performance of the listed locations and entities to all the terms of this Agreement including paying Monsanto for all Seed orders placed by the listed locations and entities Dealer will send updated lists to address specified in the then current Dealer Seed Operations Manual published by Monsanto

19. If Dealer establishes independent sales agents to sell Seed, Dealer shall provide Monsanto with a list of the agents and their addresses. Dealer shall provide Monsanto with an updated list, if changes have been made, during the dates specified by Monsanto in the then current Dealer Seed Operations Manual of each year The list shall substantially conform to Exhibit A attached hereto All agents submitted by Dealer shall be deemed approved by Monsanto, but Monsanto may withdraw its approval as to any sales agent at any time by written notice to Dealer. Dealer may only use sales agents on the list that are approved by Monsanto Dealer will send updated lists to the address specified in the then current Dealer Seed Operations Manual published by Monsanto

20. This Agreement, together with the then current version of the Dealer Seed Operations Manual and Monsanto's then current program incentive documents, if any, constitute the full understanding of the parties, a complete allocation of risks between them and a complete and exclusive statement of the terms and conditions of their agreement relating to the Seed and supersedes any and all prior agreements, negotiations, dealings and understandings, whether written or oral, that may exist between the parties relative thereto No conditions, usage of trade, course of dealing or performance, understanding or agreement purporting to modify, vary, explain or supplement the terms or conditions of this Agreement shall be binding unless hereafter made in writing and signed by the party to be bound, and no modification shall be effected by the acknowledgment or acceptance of documents containing terms or conditions at variance with or in addition to those set forth in this Agreement No waiver by either party with respect to any breach or default or of any right of remedy and no course of dealing, shall be deemed to constitute a continuing waiver of any other breach or default or of any other right or remedy, unless such waiver be expressed in writing and signed by the party to be bound

MONSANTO SHALL HAVE THE RIGHT TO SET OFF AND APPLY ANY AMOUNTS OTHERWISE PAYABLE TO DEALER UNDER THIS AGREEMENT AGAINST ANY RELATED OR UNRELATED AMOUNTS OWED TO MONSANTO BY DEALER

THE VALIDITY, INTERPRETATION AND PERFORMANCE OF THIS AGREEMENT AND ANY DISPUTE CONNECTED HEREWITH SHALL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF MISSOURI (OTHER THAN ITS RULES ON CONFLICTS OF LAWS) THE PARTIES CONSENT TO THE SOLE AND EXCLUSIVE JURISDICTION AND VENUE OF THE U.S. DISTRICT COURT FOR THE EASTERN DISTRICT OF MISSOURI, EASTERN DIVISION, AND THE CIRCUIT COURT OF THE COUNTY OF ST. LOUIS, MISSOURI, (ANY LAWSUIT MUST BE FILED IN ST. LOUIS, MO) FOR ALL CLAIMS AND DISPUTES ARISING OUT OF OR CONNECTED IN ANY WAY WITH THIS AGREEMENT OR THE SEED REFERENCED HEREIN.

ALL SEED DELIVERED BY MONSANTO TO DEALER OR BY DEALER TO DEALER'S CUSTOMERS PURSUANT TO THIS AGREEMENT ARE SUBJECT TO THE SEED LABELS.

IN WITNESS WHEREOF, the parties have executed this Agreement in triplicate.

MONSANTO

By _____

For M _____

App

Num

Dealer Signature _____

Title **President**

Dealer's Business Identification Number

**58-1148005**

All copies to Monsanto Customer Operations for approval. After approval, the white copy will be sent to Monsanto Credit, the yellow copy will be sent to Dealer and the pink copy will be sent to TSR.

9BL        1 of 3        00170

Case: 4:14-cv-00870   Doc. #: 1-3   Filed: 05/06/14   Page: 2 of 2 PageID #: 136
EXHIBIT A

Dealer Name: __OMEGA F S  0001031956_____          Date: _____

| DEALER LOCATIONS/ OTHER ENTITIES/SALES AGENTS (NAME) | ADDRESS (STREET ADDRESS, CITY, STATE, ZIP) | MONSANTO ACCOUNT # (IF ANY) | TYPE OF RELATIONSHIP (MARK ONLY ONE) | | |
|---|---|---|---|---|---|
| | | | OWNED LOCATIONS | OTHER ENTITIES | SALES AGENT |
| | | | ☐ | ☐ | ☐ |

# EXHIBIT 2



# Department of Justice

---

FOR IMMEDIATE RELEASE
THURSDAY, MAY 31, 2007
WWW.USDOJ.GOV

AT
(202) 514-2007
TDD (202) 514-1888

### JUSTICE DEPARTMENT REQUIRES DIVESTITURES IN $1.5 BILLION MERGER OF MONSANTO AND DELTA & PINE LAND

*Divestiture of Stoneville Pedigreed Seed Company, DPL Seed Lines, and Other Assets Will Preserve Competition for Farmers Throughout Cotton Belt*

WASHINGTON — The Department of Justice announced today that it will require Monsanto Company and Delta & Pine Land Company (DPL) to divest a significant seed company, multiple cottonseed lines, and other valuable assets in order to proceed with their $1.5 billion merger. The Department will also require Monsanto to change certain license agreements as a condition for proceeding with its acquisition of DPL. The Department said that the transaction, as originally proposed, would have caused higher prices to U.S. farmers for traited cottonseed and would have blocked or delayed development of traits for cottonseed that would compete with Monsanto. Traited cottonseed is seed that has been genetically modified to include highly desirable characteristics, such as resistance to insects or tolerance to herbicides.

The Department's Antitrust Division filed a civil lawsuit today in U.S. District Court in Washington, D.C. to block the proposed transaction. At the same time, the Department filed a proposed consent decree that, if approved by the court, would resolve the lawsuit and the Department's anticompetitive concerns.

In order to go forward with their proposed transaction, the merged firm must divest Monsanto's Stoneville Pedigreed Seed Company, 20 proprietary DPL cottonseed lines, and other significant assets. Monsanto must also provide the divested Stoneville company a license as favorable as DPL's current Monsanto license in terms of revenues, future traits, and the ability to combine or "stack" non-Monsanto traits with Monsanto traits. The merged firm will also have to divest to Syngenta Crop Protection AG a group of 43 DPL cottonseed lines that contain VipCot, Syngenta's insect-resistant trait technology that DPL planned to begin marketing as early as 2009. Finally, the merged firm must amend certain terms in its current trait license agreements with other cottonseed companies to allow them, without penalty, to stack non-Monsanto and Monsanto traits and to sell cottonseed that includes non-Monsanto traits.

"Without a remedy, the acquisition of DPL by Monsanto would pose a serious threat to competition for the sale of traited cottonseeds," said Thomas O. Barnett, Assistant Attorney General in charge of the Department's Antitrust Division. "The significant divestitures and licensing changes obtained by the Department through this enforcement action will ensure that cotton farmers benefit from competition to develop and sell high-yielding cottonseed with the most desirable traits."

- 2 -

The Department said that the divestitures and other relief will:

- Preserve the current competition to sell traited cottonseed;
- Prevent any significant delay in bringing cottonseed with non-Monsanto traits to the marketplace; and
- Ensure the continued presence in the market of a firm independent of Monsanto with traited cottonseed development capabilities sufficient to serve as a platform for future trait development and commercialization.

According to the complaint, the combined company would dominate the traited cottonseed market in the United States, with nearly 95 percent of all cottonseed sales in the high-value cotton-growing regions of the MidSouth – Arkansas, Louisiana, Mississippi, Missouri, and Tennessee and the Southeast – Alabama, Florida, Georgia, North Carolina, South Carolina, and Virginia.

The merger as proposed would also likely delay, if not deter, efforts to develop traits that would benefit U.S. cotton farmers. Monsanto is the dominant provider of biotechnology traits for cottonseed. Monsanto's successful commercial traits are in significant part the fruit of its long relationship with DPL, combining Monsanto's biotechnology innovations with DPL's large collection of high-quality seeds and the seed company's knowledgeable cottonseed breeders. In the past few years, DPL began partnering with other biotechnology companies and planned to offer cottonseed with non-Monsanto traits in the near future. The Department determined that the proposed merger would have eliminated DPL as a partner independent of Monsanto for these trait developers and that the transaction would have delayed or even prevented competitive products from reaching the market.

By requiring significant divestitures and licensing changes, the Department's proposed settlement will ensure that the potential harm of the original transaction will be eliminated and that competition will be preserved in this important industry.

U.S. farmers grew more than 15 million acres of cotton in 2006, and the sales of such cotton generated more than $5 billion in annual revenues.

Monsanto is incorporated in Delaware and has its headquarters in St. Louis. Monsanto is a leading provider of traits, seeds, and crop protection chemicals like Roundup. Monsanto developed the Bollgard and Bollgard II insect-resistant traits as well as the Roundup Ready and Roundup Ready Flex herbicide-tolerant traits. Monsanto had revenues of $7.3 billion in 2006.

DPL is incorporated in Delaware and has its headquarters in Scott, Miss. DPL is the largest cottonseed producer in the world and had more than $400 million of revenues in 2006.

- 3 -

Syngenta Crop Protection AG, which is headquartered in Basel, Switzerland, is a global agribusiness.  In North America, Syngenta sells a full range of crop protection products as well as commercial seeds such as corn and soy.

As required by the Tunney Act, the proposed settlement and the Department's competitive impact statement will be published in *The Federal Register*.  Any person may submit written comments concerning the proposed settlement during a 60-day comment period to Donna N. Kooperstein, Chief, Transportation, Energy and Agriculture Section, Antitrust Division, U.S. Department of Justice, 325 7th St. NW, Suite 500, Washington, D.C. 20530, 202-307-6349.

At the conclusion of the 60-day comment period, the U.S. District Court for the District of Columbia may enter the proposed consent decree upon finding that it is in the public interest.

###

07-391

# EXHIBIT 3

# LIFE SCIENCES: COMPETITION & ANTITRUST UPDATE

## HOGAN & HARTSON



## INSIDE:

**U.S. Supreme Court News**
The Doctor is Out: U.S. Supreme Court
Overrules Dr. Miles and Applies Antitrust
Rule of Reason to Vertical Agreements on
Minimum Resale Price by Philip C. Larson,
Thomas B. Leary, & Erica S. Mintzer        p2

**Developments in "Reverse Payment" Cases:**
U.S. Supreme Court Passes on Tamoxifen
while DOJ Seeks Middle Ground
by Eric Stock        p3

**Noteworthy Litigation**
Appeals Court Dismissed Challenge to
Wyeth's Loyalty Rebate Programs
by Erica S. Mintzer        p5

**District Court Allows Challenge to Becton**
Dickinson's Loyalty Rebate Programs to
Proceed by Erica S. Mintzer        p7

**Mergers & Acquisitions**
DOJ Uses Novel Divestiture Provisions to
Clear Monsanto/Delta & Pine Land Deal  by
David J. Saylor        p7

**Agencies' HSR Report: Shows Continuing**
Enforcement Interest in Life Sciences
by Joseph Krauss        p10

**EU Developments**
NHS Generic Pharmaceutical Price Fixing Case
Settles, but Fraud Cases Continue
by Marceline Tournier        p12

**French Competition Council and**
Pharmaceutical Companies Agree to Revise
Wholesalers' Quotas
by Jean-Michel Coumes        p13

This issue focuses on several important recent developments of interest to life sciences companies. We first discuss the Supreme Court's decision to deny *cert.* in the *Tamoxifen* case and the insights revealed by the Department of Justice's amicus brief in that case.  We also address several recent U.S. court decisions involving the antitrust treatment of rebate programs, as well as the Supreme Court's pivotal decision in *Leegin* – which may permit companies to exert greater influence over the prices charged by their distributors.  In the merger area, we discuss the consent decree in the recent *Monsanto/Delta* transaction and the Agencies' annual HSR report, both of which reveal important insights into the agencies' current thinking and enforcement priorities in the life sciences area. Finally, in the EU area, we review recent activity in the UK and France that reflects continued government interest in the pharmaceutical industry.

**District Court Allows Challenge to Becton Dickinson's Loyalty Rebate Programs to Proceed**
*By Erica S. Mintzer*

HOGAN & HARTSON

In June, Judge Linares of the U.S. District Court, District of New Jersey, denied motions by Becton, Dickinson and Co. to dismiss several class action complaints challenging its use of loyalty rebate programs in connection with the sale hypodermic needles. The plaintiffs in these cases purport to represent 3 distinct groups: hospitals and healthcare providers; retail pharmacies; and drug wholesalers. *In re Hypodermic Products Antitrust Litigation (Medstar Health)*, *In re Hypodermic Products Antitrust Litigation  (Jabo's Pharmacy)* , *In re Hypodermic Products Antitrust Litigation (Louisiana Wholesale Drug Co.)*.

Although the complaints varied in terms of the specific products and the precise allegations at issue, the basic challenges were similar in alleging that Becton entered into restrictive agreements with its customers that enabled it to shut its competitors out of the relevant markets. Some of the specific claims by plaintiffs were that Becton: entered "commitment contracts" with GPOs that required exclusivity; awarded GPOs with monetary payments in exchange for exclusivity; implemented anticompetitive rebate structures that included conditioning rebates on a customer buying a high share of a particular line of products from Becton (i.e., market share requirements); and engaged in illegal bundling.

Becton's motions to dismiss argued that the plaintiffs had not adequately alleged the essential elements required for their claims. Linares disagreed, holding that plaintiffs had adequately pled that the agreements were unreasonable restraints of trade, monopoly abuses, and violations of various state laws. Linares also disagreed with Becton's position that plaintiffs failed properly to plead antitrust injury and standing. Becton had argued that the failure of the complaints to allege with specificity which competitors were injured and how competition was affected was fatal to plaintiffs' action. The court  found that Becton did not present binding authority indicating that such specificity was required, and held that plaintiffs allegations that competitors were unable to compete with Becton as a result of its conduct, and Becton's subsequent pricing power, were sufficient to meet pleading requirements.

As with the *Wyeth* case above, this case highlights the proliferation in litigation about bundling and loyalty discounts. It also highlights the inconsistency in approaches taken by different courts, with the *Becton* court much more sympathetic to plaintiffs than the courts in *Wyeth*.

# Mergers & Acquisitions

## DOJ Uses Novel Divestiture Provisions to Clear Monsanto/Delta & Pine Land Deal
*By David J. Saylor*

On May 31, 2007, the Antitrust Division of the Department of Justice (DOJ) announced a consent decree allowing biotech pioneer Monsanto to buy America's largest cottonseed grower, Delta & Pine Land. Eight years earlier the parties had failed to win DOJ's approval for essentially the same

HOGAN &
HARTSON

merger. This result is noteworthy for high technology and pharmaceutical companies because the consent decree involves significant structural and licensing remedies to prevent foreclosure of Monsanto's rivals from introducing their own rival biotechnology in the downstream marketplace dominated by Delta. The settlement is also particularly noteworthy both because DOJ rarely concerns itself with vertical issues and because the consent decree takes the unusual step of divesting to one buyer Monsanto's downstream business as well as part of Delta's competing downstream business, while requiring the parties to divest the remainder of Delta's business to a separate buyer.

Monsanto is a leading licensor to seed companies of genetically modified traits, such as herbicide tolerance and insect resistance, subject to patent and other proprietary rights. A trait is incorporated (or multiple traits are "stacked") into specific seed "lines," the varieties of germplasm developed through selective breeding to improve quality, disease resistance, yield, and climate suitability. In the MidSouth and Southeast, Delta's cottonseed germplasm is of such desirable quality that the company has a dominant (79 percent and 87 percent, respectively) share of sales to farmers. Monsanto's own cottonseed company, Stoneville, is a distant second (17 percent and 8 percent, respectively).

Monsanto is several years ahead of its biotech rivals in placing its genetic traits for cottonseed into commercial production and obtaining lucrative payments from farmers. More than 96 percent of all traited cottonseeds sold in the United States, including Delta's and Stoneville's, contain one or more Monsanto inventions, *i.e.*, its Roundup Ready herbicide tolerance trait, its Bollgard insect resistance trait, and/or second generation refinements of these traits. Prior to the Delta merger announcement, however, Delta was also cooperating with several of Monsanto's GM rivals to enable them to commercialize their traits in Delta elite germplasm. For several years Monsanto rival Syngenta worked with Delta to incorporate Syngenta's VipCot insect resistance trait into lines of Delta cottonseeds that would be ready for marketing as traited seeds by 2009. Similarly, in 2006 DuPont entered into a joint venture with Delta aimed at commercializing DuPont's Optimum GAT herbicide tolerance trait in Delta seeds by 2010.

Because the merger eliminated head-to-head competition between Delta and Stoneville for cottonseed sales to farmers and because in that downstream business entry barriers are high and post-merger concentration would be extremely high (well over 90 percent), the consent decree required Monsanto to divest Stoneville. The decree also mandated that Stoneville receive a license for Monsanto's present and future cottonseed traits on reasonable terms as favorable as Delta had received from Monsanto prior to the merger. These divestiture and licensing remedies are standard fare, designed to reinstate horizontal competition in a form that will persist. The rest of the decree, however, is unusual and precedent-setting.

The DOJ was concerned that Monsanto's downstream vertical integration with a cottonseed company as competitively significant as Delta would diminish opportunities for other trait developers to incorporate their innovations in the germplasm varieties most demanded by farmers and would lead to fewer choices and higher prices for traited cottonseed than would be the case

# EXHIBIT 4

Published on *Monsanto Newsroom* (http://news.monsanto.com) on Tuesday June 19, 2007

# Monsanto Company Completes Divestiture of Stoneville and NexGen Businesses, Begins Combining Delta and Pine Land Business

**Release Date:**
Tuesday June 19, 2007

**Terms:**

**Dateline City:**
ST. LOUIS

Monsanto Company (NYSE: MON) announced that it has completed its divestitures of the Stoneville and NexGen businesses. In line with today's announcement, Monsanto will immediately work to combine the Delta and Pine Land business with its existing operations and policies.

"We look forward to working with the tremendous people at Delta and Pine Land and continuing their tradition of delivering innovation to the farm," said Hugh Grant, chairman, president and chief executive officer of Monsanto Company.

"The Delta and Pine Land business will enable Monsanto's business to support the delivery of new innovation to cotton farmers and the cotton industry, and should increase the overall competitiveness of the U.S. cotton seed industry in the global marketplace," said Grant.

Monsanto also reaffirmed its existing policy not to develop or utilize sterile seed technology, such as the so-called "terminator" technology, to which Delta and Pine Land has rights.

Monsanto Company is a leading global provider of technology-based solutions and agricultural products that improve farm productivity and food quality. For more information, please visit the company's web site at http://www.monsanto.com/.

Cautionary Statements Regarding Forward-Looking Information:

Certain statements contained in this release are "forward-looking statements," such as statements concerning the company's anticipated financial results, current and future product performance, regulatory approvals, business and financial plans and other non-historical facts. These statements are based on current expectations and currently available information. However, since these statements are based on factors that involve risks and uncertainties, the company's actual performance and results may differ materially from those described or implied by such forward-looking statements. Factors that could cause or contribute to such differences include, among others: continued competition in seeds, traits and agricultural chemicals; the company's exposure to various contingencies, including those related to intellectual property protection, regulatory compliance and the speed with which approvals are received, and public acceptance of biotechnology products; the success of the company's research and development activities; the outcomes of major lawsuits, including proceedings related to Solutia Inc.; developments related to foreign currencies and economies; successful completion and operation of recent and proposed acquisitions; fluctuations in commodity prices; compliance with regulations affecting our manufacturing; the accuracy of the company's estimates related to distribution inventory levels; the company's ability to fund its short-term financing needs and to obtain payment for the products that it sells; the effect of weather conditions, natural disasters and accidents on the agriculture business or the company's facilities; and other risks and factors detailed in the company's most recent periodic report to the SEC. Undue reliance should not be placed on these forward-looking statements, which are current only as of the date of this release. The company disclaims any current intention or obligation to update any forward-looking statements or any of the factors that may affect actual results.

**Language:**
English

**Contact:**

Monsanto Company
Media:
Lee Quarles, +1-314-694-2330
or
Andrew Burchett, +1-314-694-4452
or
Analysts:
Scarlett Lee Foster, +1-314-694-8148
or
Bryan Hurley, +1-314-694-7867
http://www.monsanto.com/

**Ticker Slug:**
*Ticker:* MON
*Exchange:* NYSE

businesses-begins-combini

# EXHIBIT 5



- [Careers](#)
- [Investors](#)
- [Select a Country](#) 
- 
- [Improving Agriculture](#)

**Featured**



18th Century| The Old Farmer's Almanac

**Finding the Perfect Planting Window: The Evolution of Weather Forecast**

Because outside factors, such as weather, affect the outcome of a crop, planning becomes a very integral part of the planting process, in an attempt to strategically manage the factors that a farmer can control. In the business of farming, weather can be friend or foe. During planting season, farmers wait for the best opportunity to...

**Partnerships & Projects**

- [Conservation International](#)
- [Field to Market](#)
- [Honey Bee Health](#)
- [Monsanto's Beachell-Borlaug International Scholars Program](#)
- [Project SHARE](#)
- [Sustainability Consortium](#)
- [Seedbed of the Future](#)
- [WEMA](#)
- [Youth Focused Partnerships](#)

**In This Section**

- o [Why Does Agriculture Need to Be Improved?](#)
- o [What Is Monsanto Doing to Help?](#)
- o [How Are We Doing It?](#)
- o [Features](#)
- [Newsroom](#)

**In This Section**

- o [Newsroom Home](#)
- o [Spotlight](#)
- o [News Releases](#)
- o [Social Media](#)
- o [Viewpoints](#)
- o [Multimedia](#)
- o [Recognition](#)

**Latest Headlines**

- o [Seminis® Showcases Strong Watermelon Portfolio at Florida Field Day](#)
  *June 2, 2014*
- o [Monsanto Company Adds Marcos Lutz to Board of Directors](#)
  *May 28, 2014*
- o [Monsanto Indonesia Works with Villages to Address Water Sanitation](#)
  *May 20, 2014*
- o [Monsanto Hawaii Improves Water Conservation Efforts](#)
  *May 19, 2014*

**Featured**

**Monsanto Recognized as Platinum Sponsor at National FFA Convention**



Last month, Monsanto was recognized at National FFA Convention as one of the five platinum sponsors of the National FFA Foundation in Louisville, Ky. Check out our infographic highlighting a few of the focus areas Monsanto supports within the FFA sponsorship.

- [Products](#)

**In This Section**

- Product Overview
- Brands
- Agricultural Seeds
- Traits and Technologies
- Vegetable Seeds
- Weed Control Products
- Research and Development
- Product Stewardship
- Weed Management
- Product Safety

**Brands**

# Agricultural Seed

- 
- 
- 
- 
- 
- 
- 
- 
- 
- 
- 
- 
- 
-

- o

## Traits, Technologies and Partnering

- o
- o
- o
- o

## Vegetable

- o
- o

## Weed Control

- o
- o
- o
- o
- o
- o
- o
- o
- o
- o

- o
- o
- o
- o
- o
- o

**Featured**

## **INTACTA RR2 PRO Soybeans**

INTACTA RR2 PRO™ soybeans are the first-ever insect-protected trait in soybeans, providing consistent and reliable control of lepidopteran pests. INTACTA RR2 PRO™ soybeans are...

## **2014 Research & Development Pipeline**

Take a peek through the window into agriculture's future by learning more about the products in our research and development pipeline...

- Who We Are

**Featured**

Case: 4:14-cv-00870-JAR    Doc. #: 9    Filed: 06/16/14    Page: 35 of 37 PageID #: 325

## America's Farmers

Our America's Farmers campaign features real farm families doing what they do every day – growing not only our food, but also our economy and our quality of life here in America. We're all connected to agriculture and it's time we, as a nation, learn more about the industry that provides for us every day.

**Our Commitments**

- Our Pledge
- Sustainable Agriculture
- Fighting Rural Hunger
- Corporate Social Responsibility and Sustainability
- Human Rights

**In This Section**

- Monsanto at a Glance
- Our Commitments
- Company Leadership
- Corporate Governance
- Company History
- Partnering and Licensing
- Procurement
- Our Locations
- Contact Us

# Who We Are

- Monsanto at a Glance
- Our Commitments
- Company Leadership
- Corporate Governance
- Company History
- Partnering & Licensing

- [Procurement](#)
- [Our Locations](#)
- [Contact Us](#)

[Home](#) / [Who We Are](#) / Georgia

# Georgia

Leesburg
DEKALB® Genetics Corp.
995 U.S. 19 N
Leesburg, GA 31763

Tifton
Seminis, Inc.
556 Armour Road
Tifton, GA 31761

Tifton
381 Williams Gibbs Rd
Tifton, GA 31793



- **Monsanto Homepage**
- 
- **Who We Are**
- Monsanto at a Glance
- Our Commitments
- Company Leadership
- Corporate Governance
- Company History

- **Products**
- Product Overview
- Brands
- Agricultural Seeds
- Traits & Technologies
- Vegetable Seeds
- Weed Control Products
- Research & Development
- Product Stewardship

- **Newsroom**
- Spotlight
- News Releases
- Social Media
- Viewpoints
- Multimedia
- Recognition

- **Investors**
- Corporate Profile

- **Improving Agriculture**
- Why Does Agriculture Need to be Improved?
- What Is Monsanto Doing to Help?
- How Are We Doing It?

- **Visit Our Other Sites**
- Monsanto Gift Store
- Monsanto Fund
- America's Farmers
- Genuity
- Asgrow & DEKALB
- Deltapine
- Channel
- Roundup

Monsanto | Georgia

- Partnering & Licensing
- Our Locations
- Contact Us

- Weed Management
- Product Safety
- 
- **Careers**
- Search Jobs

- Presentations & Reports
- SEC Filings

Ready PLUS
- Monsanto Vegetable Seeds

---

©2002–2014 Monsanto Company - All Rights Reserved   Sitemap  |  Legal Notice  |  Privacy Policy  |  Contact Us